IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CT-03334-M-RJ

| | | |
|---|---|---|
| JOSEPH O. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DREW STANLEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on defendants' pending motions [D.E. 58, 64]. Because plaintiff did not object, and because the interest in preserving confidentiality in his medical records outweighs the public interest in disclosure, the court grants defendants' motion to seal [D.E. 64]. As discussed below, the court also grants defendants' motion for summary judgment [D.E. 58].

Relevant Procedural History:

On September 6, 2022, Joseph O. Jones ("plaintiff"), a state inmate proceeding *pro se* and without prepayment of fees, filed a complaint under 42 U.S.C. § 1983. See [D.E. 1, 2, 7].

On October 3, 2022, plaintiff filed the operative verified amended complaint alleging Eighth Amendment violations and seeking monetary damages.[1] See Am. Compl. [D.E. 8].

On May 2, 2023, the court: conducted its initial review; allowed to proceed an excessive force claim against the defendant identified as "Captain McKinney," and deliberate indifference

---

[1] Because the allegations in plaintiff's verified amended complaint are based on his personal knowledge, this filing is "the equivalent of an opposing affidavit for summary judgment purposes." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

claims against Unit Manager Ward and Ms. Hargrove; but dismissed other claims and defendants. See Order [D.E. 9].

On May 22, 2023, plaintiff filed a motion for reconsideration, see Mot. [D.E. 11], which the court denied on June 2, 2023, see Order [D.E. 13].

On July 5, 2023, the court directed the clerk to update the docket to reflect that the defendant previously identified as "Captain McKinney" was, in fact, Donna McKinnon.

On July 21, 2023, McKinnon answered the complaint. Answer [D.E. 18].

On August 11, 2023, plaintiff moved for reconsideration. Mot. [D.E. 21].

On September 1, 2023, Hargrove and Ward answered the complaint. Answer [D.E. 23].

On September 5, 2023, the court denied plaintiff's August 11, 2023, motion for reconsideration. Order [D.E. 24].

On September 6, 2023, the court entered a scheduling order. Order [D.E. 25].

On September 25, 2023, and January 11, 2024, respectively, plaintiff filed what the court construed as motions to strike defendants' answers. See [D.E. 28, 32].

On April 10, 2024, the court entered a text order directing the clerk to correct the docket to reflect defendants' names as Pepita Hargrove and Curtis Ward.

On July 24, 2024, the court, *inter alia*, directed defendants to show cause as to the expiration of the dispositive motion deadline. See Order [D.E. 46].

On August 16, 2024, the court, *inter alia*, denied plaintiff's motions to strike, found good cause shown for defendants' failure to meet the dispositive motion deadline, reopened discovery, and entered an amended scheduling order. See Order [D.E. 50].

2

On February 25, 2025, defendants moved for summary judgment, Mot. [D.E. 58], and filed a statement of material facts [D.E. 59], an appendix [D.E. 60], and a memorandum [D.E. 61].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 62], but he failed to respond and the time to do so has passed.

On May 6, 2025, via a text order, the court directed defendants to re-submit plaintiff's relevant medical records, under seal if necessary. In response, on May 7, 2025, defendants filed a proposed sealed exhibit [D.E. 63], and the above-granted motion to seal, Mot. [D.E. 64]

### Statement of Facts:

The facts are disputed as noted below. At Nash C.I., on August 23, 2021, circa 1:45 p.m., Nurse Supervisor Hardison informed defendant Captain McKinnon via telephone that plaintiff refused to leave the medical building despite being instructed to return to his housing unit after receiving medical treatment. Defs.' Stmt. Mat. Facts. [D.E. 61] at ¶5. McKinnon and Lieutenant Farmer reported to the medical building, and plaintiff ended up lying on the ground outside the medical building, but the parties dispute the particulars.[2] See id. at ¶¶6–7.

---

[2] Compare Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶¶9–10 (declaring: McKinnon and Farmer reported to medical and instructed plaintiff to leave and return to his housing unit; he put a knee on the seat of a wheelchair and exited the medical building; upon reaching the sidewalk, he threw his body on the ground, "stating that he was going to Nash General Hospital"; and he was instructed several times to get off the ground and report to his housing unit), with Am. Compl. [D.E. 8] at ¶7 (stating, on Aug. 23, 2021, circa 1:30 to 2:30 p.m., as he was leaving medical, he "fell out from a sudden convulsion of blinding pain and hemorrhagic fever [sic]," and, while he was lying on the ground, Farmer and McKinnon approached as two inmates were trying to assist him into a wheelchair). The court takes judicial notice that hemorrhagic fevers are infectious diseases – e.g. Ebola or Dengue – typically occurring in tropical areas, such as Central Africa, with symptoms including fever, fatigue, weakness, muscle aches, nausea and vomiting, diarrhea, and, in severe cases, kidney, liver, or respiratory failure, and bleeding under the skin, inside the body or from the mouth, eyes or ears. See https://www.mayoclinic.org/diseases-conditions/viral-hemorrhagic-fevers/symptoms-causes/syc-20351260 (visited May 22, 2025). The court also takes judicial notice that Hemorrhoids are swollen veins in the anus and lower rectum. See https://www.mayoclinic.org/diseases-conditions/hemorrhoids/symptoms-causes/syc-20360268 (visited May 22, 2025). The record indicates that plaintiff had hemorrhoids, not hemorrhagic fever. See Defs.' Ex. 1A [D.E. 63] at 142–43 (Aug. 23, 2021, clinical encounter with Physician Assistant Downs

3

"Several nursing staff, including Nurse Supervisor Hardison and the Physician Assistant, came out to the area where Plaintiff was lying, and both advised McKinnon that Plaintiff had been treated and that there was not an order to send him to the local hospital." Id. at ¶8. "Plaintiff was also advised of this information." Id. "Medical staff assisted Plaintiff and also fashioned a cushion donut to use on his chair to assist with any discomfort." Id. at ¶9.

Two inmates attempted to assist plaintiff off the ground and into a wheelchair. Id. at ¶10. These inmates were ordered to go inside, but the parties disagree as to the particulars.[3] See id.

Plaintiff was pepper sprayed in his facial area as he was lying on the ground, but the parties again dispute the particulars, especially whether any warning was given.[4] See id. at ¶11.

Defendant Unit Manager Ward also responded, helped handcuffed plaintiff, and assisted him into a wheelchair, but the parties disagree as to the particulars.[5] See id. at ¶¶11–14.

_____

circa 12:52 p.m. noting: subjective complaint of severe rectal pain; on exam, observing multiple external hemorrhoids; prescribing lidocaine jelly; and providing lidocaine spray and two packets of "Oragel" for pain); id. at 144–47 (Aug. 23, 2021, self-declared emergency encounter with Nurse Poling circa 7:45 a.m. noting: subjective complaint of severe anal-rectal pain; vitals noted as temperature of 98.7 degrees, 108/63 blood pressure, 22 respirations per min., 80 beats per min. pulse; and 98% O2 saturation; on exam, noting anal and perineum swelling; and referred to provider).
[3] Compare Am. Compl. [D.E. 8] at ¶9 (stating McKinnon "immediately told inmates assisting [him] to go inside and for [him] to get up right now."), with Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶¶11–13 (declaring two inmates tried to assist by twice picking him up to put him in a wheelchair, but he threw his body back to the ground; and the inmates were told to go to the medical building for 2:00 p.m. count which was delayed by plaintiff's actions).

[4] Compare Am. Compl. [D.E. 8] at ¶9 (stating that, "As the inmates, staff, and [plaintiff] tried to inform [McKinnon] of the situation and [his] medical condition, without any warning or being provoked, excessive force was used against [him] when the officer pepper sprayed [him] in [his] entire facial area [sic]"), with Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶14 (declaring: plaintiff was given another direct order to get off the ground and warned pepper spray would be applied if he failed to comply; after plaintiff again failed to comply with any orders despite these warnings, Lieutenant Farmer administered a short blast of pepper spray to plaintiff's facial area).

[5] Compare Am. Compl. [D.E. 8] at ¶¶10–13 (stating: "as [he was lying] there crying and screaming in burning pain, [his] hands were cuffed behind [his] back"; "All of a sudden, [his] anus and buttocks area really started burning and stinging" due to the pepper spray and hemorrhoids; he "was rolling in pain and begging and pleading" Ward to place him on his stomach until he could be put in a wheelchair, but McKinnon insisted that he could get up and walk; when he tried to wipe his face, someone pushed his hands away; and he "kept pleading to Mr. Ward to help [him]."), with Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶¶14–15 (declaring plaintiff continued to refuse to get off the ground and defendant Ward and Assistant Unit Manager Manning were asked to assist due to plaintiff's refusal and the need to get him to the shower for decontamination; plaintiff asked Ward to carry him to the Segregation Unit, but

4

Ward escorted plaintiff by wheelchair to the RHU and placed him in the shower for pepper spray decontamination, but the parties again disagree as to the particulars.[6] See id. at ¶15.

Ward and McKinnon completed witness statements, Nurse Hardison made a record of the incident, and Unit Manager Glover wrote an investigation report, concluding: "I concur with the actions taken by staff in trying to manage the non-compliant offender. His demeanor completely changed once he was informed by the medical provider that he was not going out to the local ER. Offender was sprayed with OC PEPPER. Decontaminated and placed in RHU." Id. at ¶¶16–18.

Defendant Corrections Officer Hargrove was working the overnight shift from August 23 to 24, 2021. Id. at ¶19. Circa 5:00 a.m., Hargrove made rounds, saw plaintiff lying on his cell floor, called out to check on him and, when he did not answer or respond, called a "Code Blue."[7] Id. at ¶¶21–22. Medical staff responded, and plaintiff "was transported to medical." Id. at ¶25.

_____

Ward "advised he could not carry him"), and id., Ex. 3, Ward Decl. [D.E. 60-3] at ¶5 (declaring, circa 2:00 p.m. on Aug. 23, 2021, McKinnon radioed Ward to come to medical; plaintiff was outside the medical building, on the ground; McKinnon advised that plaintiff had been pepper sprayed by Farmer for being uncooperative and failing to follow orders; McKinnon gave Ward a directive to escort plaintiff to the RHU; Ward and Officer Milton Manning restrained plaintiff in handcuffs; and plaintiff was stating he could not walk because his rectum was hurting).

[6] Compare Am. Compl. [D.E. 8] at ¶13 (stating: Ward "told Mr. Williams to help put [him] in a wheelchair" but, when he sat down, "a sharp pain shot through [his] anus, and [his] body forcing [him] out of the wheelchair [sic]"; he "hit the ground hard screaming in severe pain"; "The nurse came outside and told them about [his] medical condition"; Ward placed him "in front of [his] wheelchair and took [him] to segregation"; and he "woke up face down on the shower floor"), with Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶15 (declaring: Ward and Manning helped plaintiff off the ground and into the wheelchair, "but he remained uncooperative and continued to attempt to throw himself to the ground"; because he was refusing to sit, Ward and Manning put him on his knees in the wheelchair seat and took him to the Segregation Unit where he was put in the shower for decontamination; any delay was due to his refusal to cooperate; after showering, staff placed him in his cell, and no further incident was reported for the shift), and id., Ex. 3, Ward Decl. [D.E. 60-3] at ¶¶7–8 (declaring: Ward got a wheelchair and placed plaintiff on his knees because, "when we tried to place him in the wheelchair in the proper way, he said that it hurt and jumped out of the wheelchair"; Ward escorted him to the RHU and put him in the shower for decontamination; he was still in the shower circa 20 minutes later when Ward left for other duties; and Ward did not see him again that shift).

[7] See Defs.' App., Ex. 4, Hargrove Decl. [D.E. 60-4] at ¶12 (declaring: "When a 'Code Blue' is issued, it does not necessarily mean that an inmate is in a life-threatening situation. A 'Code Blue' would be issued at [Nash C.I.] any time an inmate is unresponsive or not responding to an officer. When a 'Code Blue' is issued, medical or nursing must respond to assess the situation.").

5

A medical evaluation, circa 5:45 a.m., noted, although he "would not respond to commands," his vital signs appeared normal, he did not appear to be unconscious, he had normal reflexes, and he eventually was medically cleared and returned to his unit. Id. at ¶27. The parties, however, dispute the particulars, especially whether plaintiff and Hargrove interacted earlier in the shift.[8]

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249.

---

[8] Compare Am. Compl. [D.E. 8] at ¶¶15–16 (stating: he declared a medical emergency at 2:00 a.m. because he couldn't breathe, he had "throbbing chest pain and numbness on [his] right side," and his "face was swollen shut [sic]"; Hargrove denied the request and told him to wait 5 hours until 1st shift came to work; he "never made it as [he] passed out bleeding on the floor [sic]"; he "was rushed to medical 5 hours later when 1st shift came to work"; he "almost died [sic]"; and "All of this could have been avoid[ed] had someone would have got [him] medical assistance"), with Defs.' App., Ex. 4, Hargrove Decl. [D.E. 60-4] at ¶¶8–12 (declaring: when making rounds, Hargrove saw plaintiff lying on his cell floor and called out to check on him, but he didn't respond or answer verbal commands; pursuant to training and policy, Hargrove immediately called a Code Blue emergency to ensure prompt medical treatment for plaintiff; Hargrove has no knowledge of what had happened to plaintiff prior to finding him unresponsive on the floor at 5:00 a.m.; Hargrove "did not see nor speak to [plaintiff] that night prior to approximately 5:00 a.m. on the day of the incident"; the medical team quickly responded and transported plaintiff to medical while Hargrove continued her rounds; and Hargrove's shift ended at 6:00 a.m., approximately one hour after the incident).

6

In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

First, because North Carolina has not waived immunity, see Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989), and the prospective relief exception under Ex parte Young, 209 U.S. 123 (1908), does not apply, cf. Doe v. Univ. of N. Carolina Sys., 133 F.4th 305, 318 (4th Cir. 2025), official capacity claims against defendants are dismissed without prejudice.

Turning to the individual capacity claims, "to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id. (quotation and emphasis omitted); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

For an Eighth Amendment excessive force claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992) (citing Whitley v. Albers, 475 U.S. 312 (1986) ("Whitley")). Considering such a claim, courts "must ask both if 'the

7

officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. at 8 (citation omitted).

"The objective component measures the nature of the force employed, asking whether that force 'was sufficiently serious to establish a cause of action.'" Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021) (quoting Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019)). "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." Id.

The subjective component of an excessive force claim inquires "whether the officers acted with a 'sufficiently culpable state of mind.'" Dean, 984 F.3d at 302 (citation omitted). "[T]his is a demanding standard" because the "state of mind required . . . is 'wantonness in the infliction of pain.'" Brooks, 924 F.3d at 112–13 (quoting Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008)).

At summary judgment, "the inquiry under the subjective component boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and 'for the very purpose of causing harm.'" Dean, 984 F.3d at 302 (citation omitted). An officer's subjective motive may be proved through either direct or circumstantial evidence. Id. at 308–09. Four factors from which inferences may be drawn as to an officer's motives are:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

Iko, 535 F.3d at 239 (quoting Whitley, 475 U.S. at 321); see Brooks, 924 F.3d at 116.

Deliberate indifference to a prisoner's serious medical needs also violates the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the

8

denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

To support a claim that the denial or delay of medical care violates the Eighth Amendment, a prisoner must show that the official knew of and disregarded an objectively serious condition, known medical need, or substantial risk of serious harm. Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); see Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). Beyond actual knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko, 535 F.3d at 241 (quotation marks and citation omitted).

The court now considers plaintiff's excessive-force claims against McKinnon. The court accepts as true that, as he "tried to inform [McKinnon] of the situation and [his] medical condition, without any warning or being provoked, excessive force was used against [him] when the officer pepper sprayed [him] in [his] entire facial area," and that, as he was rolling on the ground in pain, McKinnon told Ward and Manning that he could get himself up and walk. See Am. Compl. [D.E. 8] at ¶¶9, 12. McKinnon, however, declares she did not use any force on plaintiff because Farmer deployed the pepper spray, and Ward and Manning handcuffed him, assisted him into the wheelchair, escorted him to the RHU, and placed him in the decontamination shower. Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶¶14–15. The record supports McKinnon's declaration but does not support an inference that McKinnon personally used any force. See Defs.' App., Ex. 2A [D.E. 60-2] at 8–13 (July 13, 2023, McKinnon response stating, *inter alia*: Farmer administered pepper spray; Ward and Manning assisted plaintiff off the ground, into a wheelchair on his knees, and to a shower for decontamination; and no excessive force was used in the incident); accord id., Ex. 2B [D.E. 60-2] at 14–18 (Aug. 23, 2021, McKinnon witness

9

statement); id., Ex. 2C [D.E. 60-2] at 19–22 (incident report); id., Ex. 3A [D.E. 60-3] at 5–6 (Aug. 23, 2021, Ward witness statement); see also Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (requiring a § 1983 plaintiff to "'affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights'" (citation omitted)).  Thus, on the present record, no "reasonable jury could find that defendant acted with malice, applying force punitively and 'for the very purpose of causing harm.'"  Dean, 984 F.3d at 302 (citation omitted).

To the extent plaintiff claims McKinnon failed to intervene during Farmer's deployment of pepper spray, the court credits plaintiff's claims that this deployment was "without any warning."  Am. Compl. [D.E. 8] at ¶9.  Presuming, without deciding, that Farmer's pepper spray use itself was excessive force, McKinnon did not possess the power to prevent it.  Cf. Brooks, 924 F.3d at 110; see Randall v. Prince George's Cty., 302 F.3d 188, 203 (4th Cir. 2002).

To the extent plaintiff claims that McKinnon delayed in assisting him after he was pepper sprayed, as discussed below, the medical record does not support any inference that this brief delay satisfied the objective component of a deliberate indifference claim.  See, e.g., Moskos v. Hardee, 24 F.4th 289, 298 (4th Cir. 2022) (noting that a plaintiff "experienced the usual transitory effects of pepper spray for a period of, at most, 90 to 120 minutes," and finding that in "[i]n circumstances such as these, involving a short delay in decontamination, without any aggravating factors such as a serious medical reaction, courts have consistently found that the objective prong [of an Eighth Amendment claim] is not satisfied" (collecting cases)).

To the extent plaintiff instead seeks to hold McKinnon liable for the actions of other officers, the doctrine of *respondeat superior* generally does not apply to a § 1983 action.  See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–

10

92 (1978). Rather, for a cognizable supervisory liability claim, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

Here, the record does not support an inference that McKinnon knew of, but disregarded, a substantial risk of serious harm, Farmer, 511 U.S. at 837, recognized her "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379; see King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023) ("At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind." (citation omitted)).

Because plaintiff has shown that McKinnon was, at most, merely negligent as to the use of force by other officers, the danger of which McKinnon "should have perceived but did not," Farmer, 511 U.S. at 838, he fails to satisfy the subjective component of an Eighth Amendment claim, or show that a supervisory liability claim sounds against McKinnon under the governing standard, cf. Shaw, 13 F.3d at 799; see Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) (noting "conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion"); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

11

Viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, McKinnon has met her burden of showing the absence of evidence to support plaintiff's Eighth Amendment claims as to her, Celotex, 477 U.S. at 325. Plaintiff, however, fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted), such that McKinnon is entitled to summary judgment, see id. (finding summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." (citation omitted)).

The court now turns to plaintiff's deliberate indifference claims against Ward.   As noted above, plaintiff's states, *inter alia*, that: after he was pepper sprayed, his hands were cuffed behind his back; Ward knew of his medical situation; he pleaded with Ward for help and assistance off the ground; due to the burning and stinging in his buttocks and anus which was worsened by pepper spray seeping through his pants, he was rolling in pain and unable "to see or breathe or move"; he pleaded for Ward to put him on his stomach until they got a wheelchair; McKinnon said that he could get up and walk; he tried to bring his hands "in front" to wipe his face but someone pushed his hands away; he was lying on the ground "suffering and crying"; Ward finally told "Mr. Williams [sic] to help put [plaintiff] in a wheelchair"; plaintiff was grabbed under the arms and lifted but, when his bottom hit the wheelchair seat, pain "shot through his anus" and he fell hard on the ground, screaming in pain; a nurse came out of medical and told them about plaintiff's medical condition; Ward placed plaintiff on the wheelchair and took him for decontamination; after "waking up in the shower face down," he kept complaining that he couldn't breathe and

12

needed medical attention; and he continued to declare a medical emergency for weeks but was not checked or screened for the RHU.    See Am. Compl. [D.E. 8] at ¶¶10–14.

Contra these claims, the record: shows he had a use-of-force evaluation at the RHU circa 3.5 hours after being pepper sprayed; shows he self-declared medical emergencies for hemorrhoid pain on August 27, and on October 2 and 3, 2021, pain post hemorrhoidectomy, but not for other conditions; and does not reflect complaints or presentation of breathing difficulties either at that time or during his numerous evaluations in the following days and weeks.    See Defs.' Ex. 1A [D.E. 63] at 137–39 (Aug. 23, 2021, Nurse Poling use-of-force evaluation at 5:36 p.m., noting: as subjective complaint, "my bottom still hurts"; for "ROS," [review of symptoms], as to history, "medications reviewed for DOT [Directly Observed Therapy] vs KOP [Keep on Person] status," as to neurology, no numbness, and as to pain assessment, "no: severity/quality assessed during Chief Complaint [sic]"; for vitals, temperature of 98.7 degrees, pulse of 80 beats per min., 22 respirations per min., blood pressure of 108/63, and 98% O2 saturation; no appearance of distress or pain or visible injury; as to skin, dry with no wounds and color neither cyanotic or jaundiced; as to pulmonary function, normal with no stridor or nasal flaring, lungs clear to auscultation; as to musculoskeletal, normal pulses and capillary refill; as to neurologic, normal muscular strength; as to mental health, no anger, hostility or depression, thought process logical, with no incoherence or suicidal or homicidal ideation, alert, and oriented to person, place, and time; as to assessment, coping ineffective regarding his "failed attempt to go to ER"; as to disposition, discharge to housing unit without restriction; and, as to "education," told how to obtain medical attention while in the RHU); id. at 134–35 (Aug. 24, 2021, 5:45 a.m. Nurse Perry Emergency Code encounter at the RHU listing, for vitals, pulse of 72 beats per min., blood pressure of 132/72, and 100% O2

13

saturation, noting, *inter alia*, that: he was found lying on his cell floor and was unresponsive to verbal commands but his vitals were stable, lungs were clear to auscultation, reflexes were normal, eyes were normal on examination, and there was a small amount of blood in his nose; he was given a dose of Narcan; he responded to a sternal rub and cold ice water in face; he asked to urinate; he told the nurse "he was hurting in his behind. And that he was pepper sprayed yesterday"; he "reported that[,] during altercation, he fell and hit his elbow and knees," and a "very small superficial scrape" was noted on his knees but not his elbows; he "continued to talk and was in no apparent distress"; and the provider instructed the nurse to send him back to the RHU); id. at 132 (Aug. 24, 2021, Nurse Perry non-patient contact encounter note at 12:56 p.m. ordering correct medication as to Narcan from 8/24/2021); id. at 131 (Aug. 24, 2021, medication renewal/review encounter at Non-Patient Contact by PA Downs entering new order for topical lidocaine cream); id. at 243–44 (Aug. 25, 2021, outpatient mental health progress note finding no diagnostic change); id. at 128 (Aug. 25, 2021, Nurse Perry non-patient contact encounter note correcting a medication order for Narcan 4mg, Nasally, one time per day); id. at 127 (Aug. 27, 2021, medication review encounter by PA Downs entering a UR request for a GI consult for severe hemorrhoids); id. at 125–26 (Aug. 27, 2021, Nurse Hedgepeth clinical encounter for self-declared emergency noting: as subjective complaint, "my hemorrhoids are bleeding and hurting"; pain level of 10 in rectum with 3-4 week onset/duration; noting, in "ROS," rectal pain, itching, burning, report of bleeding but none observed at the time; for vitals, a pulse of 88 beats per min., 20 respirations per min., and a blood pressure of 138/88; noting, on exam, presence of external hemorrhoids for which plaintiff has been approved for an UR surgical consult; as assessment, "comfort impaired"; and, as disposition, follow up at sick call as needed); id. at 123–24 (Sept. 1, 2021, return trip clinical

14

encounter with Lisa Williams, LPN, noting: as subjective complaint, "I need something for my Hemorrhoids, because[,] when they checked me[,] they started back to hurting [sic]"; for vitals, a temperature of 98.1 degrees, blood pressure of 147/92, 20 respirations per min., 80 beats per min. pulse, and 98% O2 saturation; noting, as assessment, comfort impaired due to hemorrhoids; and, as disposition, directing plaintiff to follow up at sick call as needed and continue taking hemorrhoid medication); id. at 122 (Sept. 3, 2021, record review by PA Downs, entering UR request for hemorrhoidectomy); id. at 118–112 (Sept. 13, 2021, Nursing notes encounter by Nurse Poling entering pre-op orders for hemorrhoidectomy on Sept. 27, 2021); id. at 116–117 (Sept. 27, 2021, provider evaluation by PA Downs noting: chief complaint, rectal pain; subjective complaint, follow up status post hemorrhoidectomy today, "reports he is sore now"; assessing, hemorrhoids (current, temporary/acute, improved; entering new medication orders and a UR request for a follow-up); id. at 114–15 (Sept. 30, 2021, follow-up encounter at clinic with Nurse Hedgepeth noting plaintiff "has one dose of his ordered pain medication" and "is asking if he can have further pain medication" for pain from his hemorrhoid surgery; was informed Naproxen pain medication was prescribed as needed, not every four hours); id. at 111–12 (Oct. 2, 2021, Nurse Perry clinic emergency encounter noting: he came to medical in a wheelchair in pain post hemorrhoidectomy; as subjective complaint, "I am in terrible pain, something feels like it's coming out of my butt"; on exam, a fissure noted in the rectal area with stitches not intact, but only a small amount of bleeding; called provider who recommended topical pain cream and provider follow-up; for vitals, a pulse of 86 beats per min., blood pressure of 122/74, and 98% O2 saturation; assessing "comfort, impaired" and "related to pain"; referred for Oct. 4, 2021, provider evaluation; and instructed on ice use to reduce inflammation); id. at 108–109 (Oct. 3, 2021, Nurse Perry clinic emergency

15

encounter noting: as subjective complaint, "I am hurting so bad"; as administrative note 1, he was "brought to medical again . . . complaining of pain . . . vitals are stable, he appears to be in no acute distress," "external rectal exam has not changed since assessing him yesterday," "there is no sign of blood," and he is on the Oct. 4, 2021, list to see provider; as vitals, a pulse of 72 beats per min., blood pressure of 126/72, and 98% O2 saturation; as assessment, "comfort, impaired"; and, as disposition, follow-up at sick call as needed); id. at 105 (Oct. 4, 2021, Dr. Ahmed non-patient contact telephone triage encounter at 3:58 p.m. noting: plaintiff post hemorrhoidectomy on 9/27/21; nurse called as to complaints of pain and discomfort, no bleeding, with stable vitals, and not in any distress; and advised to follow up with camp provider the next day); id. at 102–104 (Oct 4, 2021, RHU screening clinical encounter with Nurse Hedgepeth at 4:51 p.m. noting: an officer's report that plaintiff threatened to cut himself; that he wanted to see a provider about rectal pain ongoing from hemorrhoidectomy; as administrative note 1, plaintiff "was brought to medical by wheelchair . . . riding backwards on his knees," was told the provider was not in, stated he would go to Central Prison, but was told that the plan was for him to follow-up with provider the following morning, he was "both groaning and smiling," and that he "does have a cushion in the [wheel]chair to sit on"; for vitals, a pulse of 85 beats per min., 18 respirations per min., blood pressure of 106/80, and 95% O2 saturation; on exam, irritable, agitated affect, and hostility; assessing impaired comfort; and making a mental-health referral); id. at 100 (Oct. 4, 2021, Nurse Tilley nursing note encounter at 4:56 p.m. noting: as subjective complaint "my back side is on fire [sic]"; stating, in notes, that plaintiff is status post hemorrhoidectomy on 9/27/21, camp provider follow-up requested for 10/4/21 but no camp provider was available; housing reported plaintiff threatened "to cut himself if not sent out or seen by provider"; and, as to plan, follow-up at sick

16

call as needed); id. at 95–97 (Oct. 5, 2021, Nash C.I. clinical encounter with PA Downs noting: as chief complaint, rectum pain; as subjective, reporting pain with bowel movements, daily sinus drainage with no chest pain or shortness of breath; for vitals, pulse of 98 beats per min., blood pressure of 154/66, and 96% O2 saturation; as assessment, allergic rhinitis (current, temporary/acute, initial), acute sinusitis, unspecified (current temporary/acute, initial), and hemorrhoids, (current temporary/acute, improved); as disposition, follow up at sick call as needed); id. at 149–54 (Oct. 6, 2021, health screen by Nurse Riley at Warren C.I. noting: transfer from Nash C.I. post-op hemorrhoidectomy with complications, with a planned surgery at Wayne Memorial; denial of respiratory issues; and, as vitals, temperature readings of both 96.7 and 96.9 degrees, blood pressure readings of both 115/79 and 115/76, 20 respirations per min., 81 beats per min. pulse, and 100% O2 saturation); see also Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981) (providing, the court may generally rely on medical records concerning examination and treatment of the prisoner in determining whether prison officials are deliberately indifferent to a prisoner's serious medical needs), aff'd, 676 F.2d 690 (4th Cir. 1982).

The court credits plaintiff's claims that, despite Ward knowing of his "medical condition," Ward's initial attempt to place his bottom onto the wheelchair seat was very painful, causing him to fall hard to the ground, and that, after a nurse explained his medical condition," Ward put him in the wheelchair on his knees. See Am. Compl. [D.E. 8] at ¶¶10, 13–14. As noted above, however, the record reflects, and plaintiff does not dispute, that medical staff fashioned a "donut" on the wheelchair seat to ease the discomfort of sitting. See Defs.' App., Ex. 2, McKinnon Decl. [D.E. 60-2] at ¶12. There is no showing that Ward either recognized his "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or acted

17

with the requisite culpable state of mind, Strickler, 989 F.2d at 1379. Regardless, Ward's attempts to transport plaintiff via a wheelchair, whether sitting on the seat "donut" or on his knees, were a reasonable response to plaintiff's need to be taken for pepper spray decontamination despite his purported inability to walk due to hemorrhoids. Farmer, 511 U.S. at 844 (finding an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted.").

Although plaintiff claims Ward delayed in assisting him after he was pepper sprayed, the record neither support an inference that such delay satisfied the objective component of a deliberate indifference claim, see Moskos, 24 F.4th at 298, nor that Ward recognized his "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or that he acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379; see Whitley, 475 U.S. at 319 (noting it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.").

Turning to claims that plaintiff woke "up in the shower face down" and kept complaining he couldn't breathe and needed medical attention, Am. Compl. [D.E. 8] at ¶14, he does not contest Ward's declaration that Ward put him in the decontamination shower, he was still in the shower circa 20 minutes later when Ward left for other duties, and Ward did not see him again during that shift, see Defs.' App., Ex. 3, Ward Decl. [D.E. 60-3] at ¶8. Because there is no showing that Ward knew of these later medical needs, plaintiff fails to satisfy the subjective prong of the claims. See Farmer, 511 U.S. at 837 (finding no liability "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

18

inference"); Jackson, 775 F.3d at 178 (requiring "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [that official's] action or inaction."); Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (requiring an official knew of and disregarded an "objectively serious condition, medical need, or risk of harm"); Wright, 766 F.2d at 850.

To the extent plaintiff claims that Ward failed to ensure he received additional medical treatment, Ward was entitled to rely upon the opinion of medical experts from whom plaintiff was receiving treatment, and there is no indication that these experts recommended a different course of action. See Iko, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)); see also Lewis v. Hoke Cnty., No. 1:17CV987, 2020 WL 5213929, at *7 (M.D.N.C. Sept. 1, 2020) ("[P]rison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." (citation omitted)), report and recommendation adopted, No. 1:17CV987, 2022 WL 292928 (M.D.N.C. Feb. 1, 2022), aff'd, No. 22-6171, 2022 WL 1641282 (4th Cir. May 24, 2022).

In sum, after viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, see Scott, 550 U.S. at 378, Ward has met his burden of showing the absence of evidence to support plaintiff's Eighth Amendment deliberate indifference claims, see Celotex, 477 U.S. at 325, and plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, Ward also is entitled to summary judgment. See Anderson, 477 U.S. at 249.

19

The court now turns to plaintiff's surviving deliberate indifference claims against Hargrove – that, at 2:00 a.m., he requested a medical emergency because he "couldn't breathe [sic]," he had "throbbing chest pain and numbness on [his] right side [sic]," and his "face was swollen shut [sic]," but Hargrove denied the request and told him to wait 5 hours until the first shift came to work; he "never made it as [he] passed out bleeding on the floor [sic]"; he "was rushed to medical 5 hours later when 1st shift came to work"; and he "almost died [sic]." Am. Compl. [D.E. 8] at ¶¶15–16.

Regarding the incident at 5 a.m. on August 24, 2021, Hargrove declares, and plaintiff does not dispute, that Hargrove saw him on the floor of his cell, he was unresponsive to verbal commands, Hargrove called a "Code Blue," and medical staff responded and transported him to medical for evaluation. Defs.' App., Ex. 4, Hargrove Decl. [D.E. 60-4] at ¶¶8–12. These actions were a reasonable response to plaintiff's observed condition. See Farmer, 511 U.S. at 844 see also Koon v. North Carolina, 50 F.4th 398, 407 (4th Cir. 2022) ("In general, good-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances." (citation omitted)).

The 5:45 a.m. medical report neither supports plaintiff's claim that he "almost died" nor supports any inference that he then was experiencing, or had recently experienced, his reported overnight symptoms of inability to breathe, throbbing chest pain and numbness, and facial swelling. See Defs.' Ex. 1A [D.E. 63] at 134–35 (Aug. 24, 2021, 5:45 a.m. Nurse Perry Emergency Code encounter at RHU listing, for vitals, a pulse of 72 beats per min., blood pressure of 132/72, and 100% $O_2$ saturation, with the following administrative note: "Officer called stating that offender was unresponsive. Went to RHU. Officer informed me that when she was doing her rounds this morning[,] she tried to wake up offender[,] but he would not respond. Offender

20

was [lying] on the floor.   He would not answer or respond to any verbal commands.   His vitals were stable.   He was transported to medical.   He was evaluated.   His lungs were clear to auscultation.   He had normal reflexes.   Offender would not open his eyes when I ask[ed] him.   I opened them and his pupils were PERRLA.[9]   Offender continued to not answer and was now moaning.   There was a very small amount of blood in offender[']s nostrils.   Officers report that offender has a history of drug use.   Since no one saw what happened to offender[,] I administered Narcan x 1.   Offender still didn't respond.   He did respond to sternal rub and cold ice water in face, he said "F__k [sic]."   Called provider M. Downs PA.   Reviewed all information.   While talking with provider[,] I heard talking coming from room where offender was [lying].   I went into exam room and offender was leaning up talking with officer.   He then said he had to urinate. He was given and [sic] urinal.   He then proceeded to tell me he was hurting in his behind.   And that he was pepper sprayed yesterday.   He then reported that during [the] altercation, he fell and hit his elbow and knees.   There was a very small superficial scrape on his knees[,] and none noted on his elbows.   This offender continued to talk and was in no apparent distress.   He went from not responding verbally to talking and laughing with officer.   Called provider back and informed him of current findings.   He instructed me to send offender back to RHU.   Issued offender a bottle of saline nasal spray along with instructions how to use.   Instructed him to reframe [sic] from picking his nose.   He was escorted back to RHU.   Called RHU approximately 9am.   Ask about offender.   Officer informed me that he was talking with [Sergeant] and seemed to be doing ok.").

---

[9] The court takes judicial notice that "PERRLA," an acronym that stands for "pupils are equal, round and reactive to light and accommodation," is a test used during "routine eye exams, neurological checkups, and medical emergencies" to check if "pupils look and function as they should."   See https://my.clevelandclinic.org/health/diagnostics/perrla-eye-exam (visited May 22, 2025).

The court, however, credits plaintiff's claim that, circa 2 a.m. on August 24, 2021, he requested a medical emergency because he was unable to breathe and had throbbing chest pain, numbness, and facial swelling, but Hargrove told him to wait 5 hours until first shift arrived. See Am. Compl. [D.E. 8] at ¶¶15–16. Nevertheless, Hargrove's response implies that she believed plaintiff's medical condition was not substantially serious. Cf. Scinto, 841 F.3d at 225; Jackson, 775 F.3d at 178. The available record neither suggests that Hargrove "drew the inference" that her actions were insufficient to mitigate the risk of harm to plaintiff, Farmer, 511 U.S. at 837; cf. Iko, 535 F.3d at 241, nor that she acted with a culpable state of mind, see King, 76 F.4th at 269; Strickler, 989 F.2d at 1379. The record also does not support an inference that the risk of delaying medical care was so obvious that Hargrove must have been aware of that risk, cf. Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015), or that any delay in medical care caused by Hargrove resulted in substantial harm to plaintiff, see, e.g., Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018) (per curiam) (unpublished). Instead, plaintiff has shown that Hargrove was, at most, merely negligent in failing to seek earlier medical care for him. See Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it.").

In sum, after viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, see Scott, 550 U.S. at 378, Hargrove has met the burden of showing the absence of evidence to support plaintiff's Eighth Amendment deliberate indifference claims, see Celotex, 477 U.S. at 325, but plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted); see Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of

evidence" favoring the non-moving party will not prevent the entry of summary judgment). Accordingly, Hargrove also is entitled to summary judgment. See Anderson, 477 U.S. at 249.

Alternatively, because they are government officials, defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Here, because the facts taken in the light most favorable to plaintiff do not show that defendants violated his constitutional rights, defendants also are entitled to qualified immunity. Tolan v. Cotton, 572 U.S. 650, 655–56 (2014); see al-Kidd at 563 U.S. 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); see also Malley v. Briggs, 475 U.S. 335, 341 (1986) ("The *Harlow* standard is specifically designed to . . . permit the resolution of many insubstantial claims on summary judgment . . . .'").

23

Conclusion:

For the above reasons, the court: GRANTS defendants' motion to seal [D.E. 64]; GRANTS

defendants' motion for summary judgment [D.E. 58], and DIRECTS the clerk to close the case.

SO ORDERED this **23d** day of May, 2025.

Richard E Myers II

RICHARD E. MYERS II
Chief United States District Judge

24